Next case on the call of the docket is agenda number 23, case number 111-838, Nowak v. City of Country Club Hills. Counsel for the appellant? And please identify your name for the record. May it please the court in opposing counsel, my name is John Murphy. I am the attorney for the City of Country Club Hills, the appellant in this case. Good morning. This is the third time this court is called upon to interpret the Public Safety Employees Disability Benefits Act, which we all call PSEBA. In the Crowey case, this court resolved the question of what's a catastrophic injury, meaning an injury which forces a policeman or a fireman to take a disability pension retirement. The court currently has under advisement the Gaffney-Orland Fire Protection District cases, which deals with the second issue of whether or not a live training exercise is responding to an emergency, so that becomes a qualifying injury for purposes of PSEBA. This case sets forth yet another issue, and the issue in this case is whether PSEBA requires an injury that requires an employing municipality to reimburse a disabled firefighter for the fire or strike that police officer for his share of health insurance costs incurred during the period of time from the initial date of the injury to the date the employee retires. This is a pure question of statutory construction, because we come before the court on a stipulated set of facts, and accordingly the court's review is de novo. Mr. Murphy, I do have one question or series of questions just on the facts, before you get into the law here. On page 11 of your brief, you argue that the crucial date for PSEBA to be implemented for your purposes is, quote, the date the officer is forced to take a line-of-duty disability. I know that's your position. In this case, the pension board handed down its decision on October 14, 2008. But that decision awarded Mr. Nowak a line-of-duty disability pension effective September 1, 2006. Given this, why isn't September 1, 2006 the date on which Mr. Nowak became eligible for PSEBA benefits? Your Honor, that goes back to your opinion in Crowley. Catastrophic injury is now defined, as a result of Crowley, as an injury which forces that employee to retire. The language that you quote from the pension board's opinion deals with the relationship between receiving pension board benefits, receiving those PETA benefits and workers' compensation benefits. But if we follow this point through, Crowley holds that a catastrophic injury is one which forces an individual, in your Honor's opinion, to take a line-of-duty disability. But the word disability is really an adjective. It forces the officer to take a line-of-duty disability retirement pension. When did Mr. Nowak then begin collecting his disability pension? Immediately after the pension board's decision. Okay. Was he paid any retroactive pension benefits between September 1, 2006 and October 14, 2008? No, because you'll see for the pension board opinion, there are offsets. Because keep in mind, your Honor, during that first year, the officer received full pay under PETA. So year one, he received 100%. That money, there's no set-off there. So the pension fund receives, in effect, a credit for that. So he received full salary between September 1 and October 14? He received full salary from the date of the injury, which was late August of 05, for one year after that. From the end of that one year, your Honor recalls that PETA, you get full pay rather than the workers' comp, two-thirds. After the one year expired, until the date the pension board decided, there's workers' compensation. So the pension law is designed to avoid double payment to the lawyer, to the claimant. And that really resolves the discrepancy between the September 06 and October 08? That is correct, because it's two different goals. One law makes sure that the officer continues to receive his money while he's still employed. PSEBA deals with the relationship between a former officer and the former employee from that date, the date that the pension board makes its decision saying that, unfortunately, we agree with you, you have to retire because you're disabled. Thank you. That was helpful. During that year when he received full pay, did he pay insurance premiums at that time, or was that included in his pay? Here's what happened, your Honor. The officer was hurt, and I think everybody recalls at the time of the injury, the city had a collective bargaining agreement with the Teamsters, where the city pays 80% of the health insurance, the employee pays 20. So for non-injured officers, it's just a payroll deduction, like Social Security or anything like that. PETA says the officer is to be paid on the same terms as if he's not hurt. So during that first year, he received his full paycheck with a deduction for the health insurance contribution, just as if he were not hurt. Yes, the 20% of the premium cost. Total in this case, approximately $8,000, between $7,500 and $8,000. But I would have to say that Illinois Municipal League thinks it involves a lot more because of the impact that it would have on communities who have to face repaying somebody money for health insurance benefits, when in our view the statute doesn't require it. That's what I wanted to ask Mr. Murphy about the statute. There's no requirement in the statute for the city to reimburse a police officer for health insurance made between the date of the injury, as Justice Freeman was talking about, and the date of the pension board's decision. So how can a court order a reimbursement even though a reimbursement requirement is not spelled out in the statute? From your lips to the court's conference. Just give me an argument about it. Well, I agree with you because that's the thrust of our case. The statute doesn't say that. In addition, the employer will reimburse the officer for his share of the health insurance premiums incurred during the period while he was still employed by the municipality. That's where I believe Justice Hoffman's opinion fell off the tracks. You will recall that the appellate court's opinion said that, well, we don't see anything in the statute that says they don't have to do it. That, in my view, is not the way a judiciary is supposed to review a statute because that gets involved in speculation and putting gloss on the language of the statute that's just not there. I think in terms of the plain English of the statute, I think trying to figure out an oral argument when you're dealing just with words and there's not a heck of a lot of facts to talk about how not to be redundant and how to give it a good view, I think the best way to look at this, we're talking about two contracts. When I'm an employee of the city, I have a contract of employment. And that contract says you come to work, you do your job, we pay you a salary, we give you health insurance, you have to pay some of that. I get hurt. In spite of all my efforts, I'm forced to retire at the age of 30 after serving and protecting you. The legislature then has in effect imposed a new contractual relationship between my client, the city, and opposing counsel's client, the now former employee. That contract says if you were hurt chasing a bad guy, like this case, and if it turns out, unfortunately, that you have to take retirement for that, because of that catastrophe, that's what we're talking about, this poor guy now has to take a retirement and may not get another job, may not get health insurance. At that point, the law imposes a new contractual relationship between the former employee and the former employer. That's the essence of placebo. And that's my language argument. First, there's nothing in there that says it. And that leads us to my legislative history argument. Everything that was relevant to this Court's opinion in the Crowey case is equally relevant in terms of this present case. I would say that simply because the language isn't there, the Court shouldn't read it to be there. But beyond that, all of the legislative debates from the two House-sponsored, Tenhouse and Donahue, who was the Senate sponsor, said this is something we have to do because of 9-11 and federal funding, and if an officer is killed or hurt in the line of duty needing a pension, we're going to continue his health insurance. The very purpose of the law was to make sure that our first responders who end up losing their job because of serving and protecting us are not naked going forward on health insurance. And that's what Country Club Hills did in this case. Once it evolved that the rehab wasn't going to work and Officer Nowak just couldn't do it anymore, the Pension Board awarded the pension, we followed Crowey, and he gets his free health insurance for the rest of his life. We understand that, we bite that bullet, and that serves a good social purpose. But there's nothing in the law, and there's nothing in the logic of the law, which would say in addition, while the employment relation existed, we're going to pay you back. We're going to make the city pay you back for that money. You know, one of the things that strikes me in the legislative debates is that the Senate sponsor, Senator Donahue, said I am not a big believer in unfunded mandates. I don't like unfunded mandates on local government, but I think this is important. Had there been an intent of this sponsor to have what I call the clawback requirement, requiring the city to pay back this health insurance money or premiums, there would have been at least one word. There would have been something mentioned about it. So maybe the cities and villages could have weighed in on that argument. But that didn't happen. So the absence of any language in the statute, combined with the absence of any reference in the legislative debate, combined with the logic of what PSEBA is all about, all leads us to the answer that it is strictly a going forward benefit, measured from when? From the date of the catastrophe. And when does the catastrophe ripen? It ripens, according to Crowley, when that pension board says we've looked at the medical records, you can't hit fast pitching anymore, you cannot serve as a police officer anymore, and you're going to retire. At that point, the officer needs the insurance safety net. Not before then. Why? Because he's still an employee. He's still on our benefits. He still is getting his health insurance from the city of Country Club Hills by virtue of the employment relationship. PSEBA is an exception to the rule that when the employment relationship is over, it's over. They determined the effective date was September 106. In October of 08, that determination was made. During the period then from September of 06 until October of 08, he was arguing he was an employee, he had insurance, he paid his 20% continually. He didn't receive a salary, though, did he? He received workers' comp? For the first year, he received the salary from the city. Once the PETA benefits stopped, let me just back up a little bit. He always gets workers' compensation. The way this really works in the field, Judge, is that we pay him his full pay, and then he endorses over his comp check so he doesn't get paid twice. So once, understand, Your Honor, that he gets it. Even from the period of September, after PETA expired, the city continued paying his full salary until October of 08? After PETA expired, he continued on workers' compensation. But the city wasn't paying his salary at that point? Only by virtue of paying workers' compensation premiums. But the officer was still on our books, still an employee of the Country Club Hills Police Department, still receiving benefits, still accruing seniority for purposes of the salary schedule. That's statutory. So he was still an employee to whom we were obligated. Does the workers' comp benefit equal his salary? Not after PETA. Workers' comp, I think it's 65% or two-thirds, right in that neighborhood. I think part of the tradeoff on that, I don't think he has to pay state income taxes. But it's not 100%, certainly. Maybe I missed something. I don't know if you misspoke. Your position is that we're looking at the date of declaration of disability for perceived purposes by the pension board, not the date of the catastrophic injury. I thought you said the opposite, but maybe I missed that. Let me make myself absolutely clear. At the time the pension board determines that he has suffered a line of duty disability, that means he retires. That's the date, the date of the pension board decision, meaning that as of now he's retired from the country club Hills Police Department. That triggers the placebo post-employment. That's what I understood your argument to be. I think we're all kind of struggling with the same thing. This point, when did this point occur? When did he retire? What date, what event triggers his retirement? If we're going to distinguish between him being an employee and a retired officer, what is that date? And I think you make the argument that the retirement is when the board determines moving forward the kind of disability pension he will have. However, we're struggling, I think, with the fact that the order says that it is effective in September of 06. What does that mean? That means that deals with the relationship between receipt of money from the city and the offsets that occur under the pension law, under 40 ILCS 5-3-114. And the statute says that an officer who was injured in the line of duty shall be entitled to a disability retirement pension. Let me just kind of back up to clarify my point I made in response to Justice Thomas's question. The statute says catastrophic injury. The injury, the bad knee, the bad back, is not catastrophic. The catastrophe does not occur until the time the pension board has adjudicated the fact that he's not coming back to work. He is permanently disabled and can no longer come back to employment as a police officer. That's the date. So that's the date of the pension board decision as opposed to where they claim the effective date of the injury. Certainly the pension board's decision certainly doesn't answer the question of the complete absence of statutory language calling for reimbursement. It simply, we don't know if the guy's not coming back to work until the final decision of the pension board. And at that point, the employment relation is severed. Is the police officer on the police department's payroll during the period between September 06 and October 08? For the first year he is on our payroll because of our obligation under the PETA law. My question is in that interim period that we're talking about, after the year has completed and before that determination, is the officer on the payroll? And I'm speaking about a specific thing. And I don't mean to spring the same. There's a statute currently dealing with accident and health insurance and specifically about police officers' continuance privileges. How statutes are requiring that municipalities provide continuing coverage for police officers after they retire. And there's some very specific discussion of what day that occurs. The retirement or disability of a police officer in terms of their health insurance. The retirement or disability period of a police officer means the period which begins on the day the police officer is removed from a municipality's police department's payroll because of the occurrence of any of the following events. Three, the police officer's disability is established under the Illinois Pension Code. So at least in terms of how insurance is looked at, there's this significance of the officer leaving the payroll on a certain day when the board decides disability under the pension code. So that's my question. Was he on the payroll in that interim period before the board made its determination as to disability? I believe the statute you're referring to, Your Honor, deals with the general rule that retired or disabled police officers can stay on our group health insurance if they pay. But that right, similar to what I'm arguing, does not arise until, as what you quoted, the disability is confirmed. It is no longer on the payroll due to the disability. But otherwise, you're dealing with the happenstance of when the city's obligation would arise. I mean, then we're saying, well, perhaps the obligation doesn't arise during the first year because he's getting full pay and is on our full pay status. Maybe it arises after the first year because he's on part pay status and because it's a, he's getting it indirectly through workers' compensation. Those maybes, Your Honor, suggest to me that the legislature never contemplated these issues, never contemplated parsing out as between the date of the injury, the date PETA expires, how long it takes the gentleman to get a final determination by the pension board. Does it take one year or five years? Those things simply weren't considered by the legislature. Have you answered Justice Tice's question? I have. Your time has expired. Thank you, Your Honor. Good morning. My name is Frank Solani from Mokina, Illinois. That young man at the council table behind me to my right is my son, Nicholas Solani. He's from Orland Park, Illinois. And it's our privilege today to represent Sergeant Don Nowak. The issue before the court, as narrowly stated, and the contention that we have with respect to that issue, is that where is here an otherwise eligible employee who is injured and never returns to his job is entitled to benefits accruing from the date of that injury thereafter, or whether or not he's only entitled to benefits from the date of an adjudication. We believe that the legislature could not have intended that it was on the date of adjudication that he'd be allowed benefits, because that turns out to be a very arbitrary date, in fact. The Pension Act only requires a pension board to meet four times a year. A single continuance could cause a loss of six months of benefits. The same act requires certification by three doctors that the officer cannot perform his duties. Getting three doctors together takes time and could cause a continuance that, again, could lose benefits under the act. What if somebody appeals a pension board decision? And that decision isn't made until a year later or two years later. The legislature did not intend to. Mr. Salani, what about the other side of the arbitrary coin? And I think that was raised primarily in the Municipal League's amicus brief, where they talk about sometimes, and I know it's not the case here, but there's no clear date of injury. There's been appellate court decisions in which career-ending catastrophic injuries resulted from one particular trauma. The cumulative effect of number of traumas. There's even been, I think, appellate court cases where prior to the date of employment there was a catastrophic injury that was exacerbated or aggravated after that point. So are there two sides to the arbitrary coin? The legislature enacted this act, the Public Safety Employees Benefit Act, to relieve injured employees of a financial burden. Not municipalities. And I hesitate to answer questions about other cases. I wasn't hired to handle other cases. Those cases can be decided by this court on another day. And prudence and a conservative view would necessitate that that's the way it be handled. When those cases come before this court, then the court can make that determination. But as to my client, as to Sergeant Nowak, as to somebody who, there is no payment that the State of Illinois or any municipality could make. I appreciate that, Mr. Salani. But you start to realize that when you sit here that your pronouncements affect more than just this case. I mean, this isn't a Rule 23. If we say that it's from the date of injury, it's from the date of injury. I guess it leaves, your point is well taken. It leaves other courts to determine when that injury occurred. But isn't that somewhat problematic? Well, I think there are two reasons here primarily why the date of injury means the date of the injury, you know, August 21, 2005. If I was pressed for a definition of what the date of injury should be, what catastrophic injury would be, I would say that it would be the date upon which he can no longer perform his services as a police officer. And there's a reasonable likelihood that he will never be able to return to those things. Those are the types of considerations that would trigger his attempt to obtain a pension. They ultimately are the defining evidence of whether or not he receives that pension, because contrary to what I kind of gave the impression here is, he can get a pension, and if his condition improves, that he could be, you know, subject to, you know, that pension being taken away. So really the triggering date is the date upon which he can no longer perform his work, and there's no question here, but that he suffered a tibial plateau fracture, which attendant to that is going to be atrophy to his quadricep muscles. Detective Nowak wrestled in the dirt with a resistant arrestee, he never returned to his job, and if we had to wait for the adjudication to finalize, and this particular adjudication was appealed, he still would not be received, under the municipality's interpretation, he still wouldn't be receiving benefits. And that's not what the legislature intended. They intended to benefit people who are dodging bullets from gangbangers, pursuing fleeing felons, and wrestling in the dirt with arrestees. That's what the intention was. How about the contractual nature of this? You don't dispute that he was on full pay until there was a declaration of permanent disability, right? He received one year of PETA benefits, an entirely different statute with an entirely different purpose. After that he received, and I represented him in his workers' compensation case, two-thirds of his average weekly wage, that's it. So he had to pay his own insurance premiums after the first year. During the first year his premiums were deducted, even though the Public Safety Employees Benefit Act puts the burden upon the employer to pay, quote, the entire premium, close quote. And what Justice Hoffman's analysis is perfect. It's perfect. And it was not objected to by any other member of his panel. And the analysis was carefully tailored to the fact that the pension board's finding is tantamount to a finding that he suffered a catastrophic injury from day one. That the reason why you have that retroactive clause to September 6th, is because he can't get pension benefits during the year he gets PETA. PETA specifically has an offset for pension benefits. And for a short period of time after there, as explained by Justice Hoffman in the decision and in the pension decision itself, there's another week or so in there where he's not entitled to pension benefits. But that technically is a finding that he was entitled to pension benefits from day one. And the only reason he doesn't get pension benefits from day one is because there are credits, as counsel indicated. But as far as a factual finding is to be made. Did day one, the injury? In 05, he suffered a serious career-ending injury on that date. He never returned to full duty after that date. He could reasonably anticipate that from the get-go. The fact that he hoped that perhaps he might be able to bring his quadricep muscles back is not really relevant to our analysis here. Now, there are cases. And the Municipal League points out some cases. I mean, I suppose that if a guy works for six months or a year after the occurrence, you know, perhaps there is a question at that stage of the game as to whether or not his triggering event is a later point in time. That's why the, you know, when I'm pressed, and again, I don't have this case. When you don't have a case, you don't think through things the same way. But if pressed, I think the answer would be the date upon which he is unable to work and there's a reasonable possibility or a reasonable likelihood, however you would phrase it, that he's never going to return to day job. What's the difference between the remuneration he was receiving when he was on full salary and what he gets on his pension benefits? I mean, roughly. Well, a line of duty pension is 65 percent of his wage. The PETA benefit was 100 percent. But he was definitely better off under the contract of full employment than he is under his pension, right? There is a contractual argument, too, that under full employment, 20 percent is paid by the employee. So when you say that because of the financial hardship, I think is the way you put it before, I mean, he's under more of a financial hardship once he's taking his pension, right, than when he was under full employment. Well, even when he's getting his TTD. I mean, here's a situation where he received two-thirds of his average weekly wage. Average weekly wage, by the way, is predicated on his earnings during the one-year period prior to the occurrence, not his earnings on the date of the occurrence. So he's suffering kind of a retroactive pay cut to begin with, and he's only receiving two-thirds of that retroactive pay cut. And then he's paying, after the first year, his 20 percent of his premium. Income tax. Well, the tax considerations are another matter. It is true that the TTD is not a taxable event. So even though he gets two-thirds of his average weekly wage in terms of the tax, there are many, many considerations that would have to be taken into consideration. And my suggestion would be that you decide this case based on the facts of this case. Is the statute ambiguous, counsel? The statute is silent. Does that make it ambiguous? There is case law that says that in certain instances I think silence of the statute could render it ambiguous. I don't think that's the case here. I think that the language that counsel points to in his brief and argues to the court is language that was general. It was from the general synopsis of the bill. The idea of talking about an isolated incident, of using the words going forward or continued hereafter, could just as easily be interpreted to mean going forward from the date of the injury as from the date of the adjudication. The date of the adjudication is mentioned nowhere and really makes very little sense when you think about it. There are parties under the Act, for example, a county sheriff, who wouldn't have a pension board hearing. In other words, the idea of tying it to the decision date of the pension board hearing clearly can't be the intent, because the Act on its face includes parties that don't necessarily appear in front of a fire, you know, under Article III of the pension law. So it's doubtful that there was any intent to tie it in to the litigation date. And again, the litigation date, that could last forever. The arguments about contract, especially the constitutional arguments, you know, if you're going to attack a statute and attempt to show that it's unconstitutional, you know, the burden's on you. It's a heavy burden. There's no showing here that this contract preexisted the enactment. And I think it would be safer to make the other assumption. So the idea that the contract clause is implicated is not accurate. And again, although the municipalities have concerns, a lot of the concerns in their brief went to the whole of the Act, not to when the benefits would be payable. That's a matter for the legislature, and the legislature's made its decision. And I think it's a wise decision. Speaking of the legislature's decision in terms of the language of the statute, could you address the portion of the statute, Section 1D, that provides that an officer receiving PETA benefits shall not be entitled to any benefits for which he would qualify because of his disability under the provisions of the Illinois Pension Code? The appellate court talked about salary and compensation. The actual language of the statute says any benefits. Why doesn't this preclude the benefit of payment of health insurance pursuant to the Pension Code? Because Justice Hoffman was, I don't know if he articulated, but he was correct in that the benefits that are listed in 1D are of a certain nature. They are benefits that are meant to compensate for wage loss. And when you have a class of benefits listed in a statute, then the assumption is that the general word refers to that class. So it was a very good decision, a very well thought out decision. Just tell me a little bit, are you telling me if we look at the Pension Code somewhere, can you direct us to where it says here are benefits and when it describes what the benefits are, it does not include the payment of health insurance? If you look at 1D, okay, which is the exceptions to PETA, okay, the list there, okay, there is a list. Am I correct? I mean, maybe I'm thinking of the other act, but my recollection is that there is a listing of benefits and that those benefits are all of a certain nature. To wit, they are benefits that go to wage loss. And PETA and PSEBA is not a wage loss benefit. If you look at the exceptions under PSEBA, they are exceptions that go to actual insurance. And that's why PETA benefits is not listed there. So there is a clear set of exceptions on each side in each statute. They are saying what the applicable exceptions are right in the statutes. Two statutes don't conflict, and Justice Hoffman was correct when he said that. Mr. Salani, the legislative history on the purpose of PSEBA talks in terms of continuation. I believe they say continuation of coverage for officers killed or permanently disabled in the line of duty. So my question is, doesn't the word continuation imply that coverage, that it's dealing with coverage that would otherwise cease, you know, by death, by permanent disability? No. First of all, I think that the word continuation can just as easily be taken to mean continuation from and after the date of the occurrence, the date of the catastrophic injury. The real crux, you know, is generally a common law. You're entitled to benefits from the date of cause of action and cruise through the date of trial, not at the date of trial. I mean, if you're off work because of an injury and you miss two years of work, it isn't like you get your wage loss from the date of trial onward. No, it reaches back to the date the cause of action accrued. And the question here is, when did Sergeant Nowak's cause of action accrue? And he was unable to work from the date of the occurrence. Is this statute in derogation of the common law? No. No, and the reason it's not in derogation of the common law is because that is the common law rule. That is the common law rule. And my assumption is that where the statute is silent, the intent is that the common law rule be applicable. It's not a derogation of common law. It doesn't speak to the issue of exactly when it starts. And that's why I think Justice Hoffman was right on that issue, too. I couldn't agree more with the decision, obviously. Well, back to continuation for a minute. At the date of the catastrophic injury, there are benefits. On the date of the catastrophic injury, there is a PETA benefit. And there's a worker's compensation benefit.  So, again, you don't think the continuation implies coverage from the date of death or permanent disability, a declaration of permanent disability? I don't understand how it could be continuation from and after the date of the adjudication. The date of the adjudication is such an arbitrary date. And I can't ascribe to the legislature the idea that they would choose as a date that the benefits accrue the date that the board happens to convene or the doctors happen to get all of their documentation together or whether somebody takes an appeal or not. That's not my experience with how they handle other problems, and it's doubtful that they handle this one in that way. If there's anything else, I would simply ask on behalf of Sergeant Nowak and his family that you award him the benefits that are due him for an injury that caused him to end his career on August 21, 2005. I guess I do have one question. For the first year after the injury, was he out of anything? I know you're suing for $3,083.88, the 20 percent that paid, I believe. But was he not having that deducted on the same basis that he had when he was working full time? We're suing for only $8,300. And the $8,300 represents $3,000 that they took from his salary when there was a statute that said they had to pay the entire premium. Is that what PETA says or is that what PSEBA says? That's what PSEBA says. Okay, but PETA says they pay on the same basis for that one-year period, does it not? PETA is a statute that is intended to govern matters about compensation for wages. There's no applicability here? No, they're separate. They're separate statutes. That's what Justice Hoffman found. I agree with him. And I think that there's a clear effort in the statutes to distinguish between the two because the exceptions, if you take a look at the exceptions under the two acts, you'll see that one relates entirely to wages, one relates entirely to insurance, and that's one relates entirely to insurance. And the other relates entirely to insurance. So you're saying there would be no rationale for this Court then to make the PSEBA benefits effective as of September? September 1, 2006. No, because the date of the pension board in effect found that he was unable to work from the date of the injury. That's because PETA excludes pension benefits. The pension benefits are wage-related benefits. They're based on his wage, 65 percent of his wage. And that would be a double payment for him to get 65 percent of his wage and his full wage. Thank you. Thank you, Counsel. Thank you, Your Honor. A few brief points, Justice Garmon, in response to your question. Of course this statute is in derogation of common law. Employers are not at common law obligated to provide health insurance to its employees, much less health insurance to former employees. So when the Court does its balancing, if it's a close question, we should win, because we're all in agreement that there's nothing explicitly saying that in addition to making sure that for the rest of his life he has health insurance, that we repay this obligation. Much of the discussion that's gone on in response to Counsel's argument deals with, is it a better deal the first year? Is he paying income taxes on workers' compensation? What's the relationship with the pension code? Of course there is none, because pension is wages only. I think that deflects, Your Honor, from what the legislature was trying to do with this law. This law was prompted by 9-11. It was designed to deal primarily, as Justice Thomas indicated, with continuation to make sure that the first responders who get wrecked serving and protecting us aren't without health insurance for the rest of their life once they're off the municipal payroll. That's the purpose of the law. That's what Representative Tenhouse says, if somebody's injured or killed in the line of duty, we're going to continue to benefit. They don't really even talk about cost in the debates. Senator Donahue, we're going to make sure that we continue it for these people. So the focus of the law is not in parsing things out as between, well, the first year because PETA says benefits are not recoverable because you're on full pay, and the relationship about paying taxes or not paying taxes under workers' comp, I think that's a fool's errand for the core purpose of interpreting this statute. The goal was to make sure that police officers and firemen who are forced to retire still have health insurance and that the taxpayers whom they protected absorb that cost. That's the deal. And there's nothing to indicate that the legislature even thought about parsing out these relationships between date of the injury when PETA expires, when workers' comp expires. It is our fallback argument, Justice Carmeier, but we hope we went on the main argument. It really has nothing to do with any of that. And when we interpret a statute that imposes, you know, it's an $8,000 obligation on Country Club Hills. It's a $5,000 on Olympia Fields, onward, onward, onward. It's an obligation on every municipality of the state. If there was an intent from the legislature to go backwards, they could have easily said it. And the difference between this period of time from the date of the injury when the pension board made its decision, and the day after the pension board made its decision, is that from the date of that injury until the date of the injury, the state until the date of that pension board decision, the city of Country Club Hills was obligated by its laws and by its collective bargaining agreements to provide health insurance to Don Nowak. The day after that pension board decision, the city of Country Club Hills, but for this statute, was no longer obligated to provide free health insurance. To be sure, Your Honor, there's a provision that you cited that if the officer wants to pay 100% after any retirement, he can do it. But full pay health insurance obligation only started to run on the date the employment relationship ended. I would respectfully submit to the court that given the canons of statutory construction that this court has repeated, I counted five times this year in reported opinions, I didn't cite the Maxim case, but that's one of the cases in the last year, that if it's a close call, in light of the fact that this law imposes a new, unheard of, and substantial, or in the words of the appellate court, a very generous benefit to police employees, that the obligation be clearly spelled out so that the cities and villages can understand first, when a law is being proposed, what we're, what's proposed to be getting into, and secondly, so that all of the cities and villages in the state can understand what their potential obligations are going to be when one of our police officers or firemen are hurt. I thank you for your consideration. Thank you, Mr. Murphy. Thank you as well, Mr. Solani, for your arguments today. Case number 111838, Don Nowak versus the City of Country Club Hills is taken under advisement as agenda number 23. Thank you.